Filed 10/16/24  P. v. Lopez CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LUIS DANIEL LOPEZ,<br><br>Defendant and Appellant. | F085826<br><br>(Super. Ct. No. F21907032)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Arlan L. Harrell, Judge.

Michael J. Aed for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted Luis Daniel Lopez (appellant) of second degree murder of Alex Solorio (Pen. Code, §§ 187, subd. (a), 189, subd. (b))[1] with an enhancement for the personal use of a deadly or dangerous weapon (§ 12022, subd. (b)(1)). The trial court sentenced appellant to 16 years to life in state prison.

On appeal, appellant contends the trial court erred by failing to instruct the jury with CALCRIM No. 522 (Provocation: Effect on Degree of Murder), the evidence was insufficient to sustain the second degree murder conviction, he was denied access to a competent expert witness, and defense counsel was ineffective for various reasons. We conclude the conviction was supported by sufficient evidence, and that no error occurred. We affirm.

## PROCEDURAL BACKGROUND

The Fresno County District Attorney's Office filed an information charging appellant with murder (§ 187, subd. (a)), with an enhancement for the personal use of a deadly or dangerous weapon (§ 12022, subd. (b)(1)).

In appellant's initial trial, the jury acquitted appellant of first degree murder (§§ 187, subd. (a), 189, subd. (a)) but was unable to reach a verdict on second degree murder. The trial court declared a mistrial, and the matter was retried.

At the conclusion of appellant's second trial, the jury convicted appellant of second degree murder and found true the enhancement for the use of a deadly or dangerous weapon.

Prior to sentencing, appellant retained new counsel, and filed a motion for a new trial pursuant to section 1181.[2] The motion was based on various grounds, including the

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

[2]  The new trial motion was litigated by appellant's counsel on appeal.

claims raised in the instant appeal.  The trial court denied the motion in a detailed written order.

## FACTUAL BACKGROUND

### I.     Appellant and Solorio Fight At Their Barbershop.

Appellant and Solorio both worked at a barbershop in Fresno.  On the evening of May 29, 2021, after attending a child's birthday party, Solorio and his friend Johnny Lopez[3] rode their motorcycles to the barbershop.  Appellant was walking toward the shop when they arrived.  Johnny and Solorio parked their motorcycles inside.  Johnny, appellant, and Solorio then sat inside of the main room of the barbershop and talked, drank cognac, and listened to music.  Solorio drank more than Johnny and appeared buzzed, but he was not slurring his words or stumbling.

Johnny testified that at some point, appellant and Solorio began "play wrestling," which he described as pushing each other around while laughing.  Johnny walked into the back room of the barbershop, then heard appellant yell, "Don't kick me."  When Johnny returned to the main room, he saw Solorio shove appellant against a wall.  Appellant and Solorio began pushing each other aggressively, knocking each other into furniture and barber equipment.

Johnny walked to the back room a second time and texted his girlfriend about what was happening.  When he went back to the main room, he saw appellant on the floor and Solorio standing over him, throwing punches at his body.  Johnny tried to break up the fight by grabbing Solorio, but Solorio pushed him and told him to get out of his way.

Johnny returned to the back room to collect his belongings, and to call or text his girlfriend that he was leaving soon.  He could hear appellant and Solorio arguing and things being pushed around.  When he returned to the main room, the lights were off.  He

---

**3**     To avoid confusion with appellant, who shares the same last name, we refer to this witness as "Johnny" throughout the opinion.  No disrespect is intended.

could still hear appellant and Solorio fighting.  When the lights came back on, Johnny saw even more furniture and barber equipment had been knocked over.  Appellant was sitting on the ground fixing his hair.

Johnny approached Solorio and told him to leave.  Solorio unlocked the front door of the barbershop and opened it for Johnny.  Johnny told Solorio, "Let's go.  Let's just leave."  Solorio responded he was "going to handle this," and that they would talk when he got home.  As Johnny went to the back room to get his backpack, he saw appellant bleeding from his forehead area.  Appellant was holding paper towels over the wound, and there were four or five drops of blood on the floor.  Although Johnny could not see the injury, photographs of appellant showed an approximately one-half-inch cut near his left eye.

As Johnny exited the barbershop, he again told Solorio to come with him, and Solorio responded, "Just leave."  Johnny testified that Solorio still appeared irritated but was calmer and more relaxed than he was during the fight with appellant.

Johnny did not hear from Solorio after he left the barbershop.  He clarified that he did not see anyone use weapons during the altercation.

## II.    Appellant Admits to a Nearby Resident That He Stabbed Someone in the Barbershop.

Later that evening, around 11:00 p.m., a resident at a mobilehome park near the barbershop was carrying items out to the trash when she was approached by appellant.  The resident testified appellant stated, "Ma'am, I need to come in and use your phone.  I just stabbed somebody and I need to get ahold of somebody to come and get me."  He repeated, "Ma'am, I need to use your phone to call somebody to come and get me or the cops are going to get me."  The resident was scared and did not respond.  Appellant again stated, "I stabbed someone and killed the guy at the barbershop.  I need to use your phone."  The resident told appellant to "[g]o away," and went inside to call 911.  She

4.

watched from her window as appellant looked around as though he was deciding where to go. When she looked outside a few minutes later, he was gone.

The resident tried calling 911 but was unable to reach a dispatcher, so she waited until the next day to try again. She also called the manager of her mobilehome park and left a message on the answering machine. A recording of the message was admitted into evidence. In the message, the resident stated, "There was a guy that just came to my house … and he said that he hurt some barber over here, and he needs help .… And, it scared me to death, I didn't know what to do."

### III. Solorio is Found Dead the Next Morning Inside of the Barbershop.

John Twinn[4] worked at the barbershop with appellant and Solorio and had known them for several years. Appellant and Solorio usually got along, but sometimes had heated arguments. One time, he saw Solorio push appellant into a desk.

A few months before Solorio's death appellant showed John the knife he carried. John described it as a five- to six-inch-long folding knife with a single-edged blade. He was not aware of any weapons in the barbershop.

On May 29, 2021, John worked at the barbershop with appellant and Solorio. The atmosphere in the barbershop was normal, and everyone was getting along. John left the barbershop around 5:30 p.m.

The next morning, John went to the barbershop to start work. When he opened the front door, he saw the main room was a mess, and there was blood on the floor. A motorcycle was parked inside. John tried calling appellant and Solorio but was unable to reach them. He called his supervisor and described the scene, then went home. About 15 minutes later, he received a call from his brother Joseph, and went back to the

---

**4** To avoid confusion between John Twinn and his brother Joseph Twinn, who also testified at trial, we refer to them by their first names throughout his opinion. No disrespect is intended.

barbershop. When he returned, Joseph walked to the back of the barbershop, then told John to call 911.

Joseph testified there was "blood everywhere" in the barbershop and items knocked over. He saw drag marks on the floor leading to the back room. He opened the door to the bathroom, which is attached to the back room, and found Solorio's body inside.

Fresno Police Department Officer Loren Kasten, the primary detective assigned to the case, arrived at the scene later that day. He observed several blood drops on the floor about five feet inside of the front door. Further inside, there was a large pool of blood near the main work area. There were blood stains on the floor consistent with a body having been dragged to the back room. In a storage closet, there was a mop bucket with fluid that appeared to be mixed with blood. The tile floor in the back room appeared to have been mopped. Inside of the bathroom, Kasten saw Solorio lying on his back, deceased.

## IV.    Solorio's Autopsy.

A forensic pathologist conducted an autopsy on Solorio's body. Solorio was six-feet tall and weighed 213 pounds. A test of his blood revealed a blood-alcohol content of 0.18 percent.

The pathologist observed 11 stab wounds (deeper than longer) and 24 incised wounds (longer than deeper) on Solorio's body. There was one stab wound to the neck, six to the front of the chest, two to the left side of the chest, and two to the abdomen. The stab wounds to the left side of the chest were three to four inches deep and penetrated Solorio's lungs. There was an incised wound to the head, which cut close to the skull, and an incised wound to the neck. There were incised wounds to the chest that penetrated the underlying muscle. There were incised wounds to the left buttock, left inner thigh,

back of the left leg, and back of the left ankle. Solorio also had an apparent defensive wound to his left index finger.

The pathologist opined that most of Solorio's injuries were caused by a single-edged knife. Solorio must have received his wounds during an altercation that lasted several minutes, as the injuries could not have been inflicted in "one frenzied action." Based on the location and direction of the stab wounds, they were likely inflicted while Solorio was facing his attacker. The injuries to his legs and buttocks were likely inflicted while Solorio was lying face down on the floor.

Solorio's major cause of death was penetration of the left lung due to multiple stab wounds, but all the injuries may have contributed to his death due to blood loss.

## V. Appellant's Initial Statements.

Kasten interviewed John on May 30, 2021, the day Solorio's body was discovered. During the interview, appellant called John, and Kasten recorded their conversation. Appellant told John that Solorio started a fight with him "out of nowhere" at the barbershop and "stomped [him] out." He threw some punches at Solorio, but Solorio overpowered him. He stated his eye was injured and sent John a photo showing the cut next to his left eye.

Appellant stated he left the barbershop in a taxi after Johnny left. He claimed a client messaged him on social media that Solorio was dead, and told John, "Please tell me this is not true." He denied knowing how Solorio was injured.

Early the next morning Kasten called appellant's phone and recorded their conversation. During the call, appellant stated they got into a "little scuffle," and that Solorio beat him up. A few minutes after Johnny left, he was picked up in front of the barbershop by a taxi. He provided the name of the taxi company, the make, model, and color of the taxi, and described the taxi driver. Appellant stated he took the taxi to his girlfriend's house, then used a ride-hailing app to get to his mother's house.

7.

Appellant stated he left the barbershop because he was the victim and was concerned things might escalate further. He did not call the police because it was "just a scuffle" and he has been beaten up before. He claimed he did not know Solorio was dead until he was told by other people. He reiterated that anything that happened after he left had nothing to do with him. Kasten asked appellant to meet him for an in-person interview, but the call disconnected before an arrangement was made.

Two days later, appellant called Kasten and stated he was willing to be interviewed to "clear [his] name." During the interview, appellant stated he went to work at the barbershop around 5:00 p.m. on May 29, 2021. Solorio and John were there when he arrived, but both left soon after. After appellant finished with his last client, he went to the liquor store next door to buy a snack. When he returned to the barbershop, Solorio and Johnny arrived with a bottle of cognac.

Appellant claimed he ordered a taxi through a ride-hailing app, but decided to walk to his mother's house because the taxi was delayed. Before he left, Johnny asked him if his motorcycle would be safe inside of the shop. Solorio told Johnny his bike would not be touched because he would "beat [appellant's] ass." Appellant and Solorio shook hands, but the handshake became aggressive, and Solorio pushed appellant against a wall. Appellant grabbed Solorio, and Solorio pushed him into his barber station, knocking over items and spilling fluids onto the floor. While appellant and Solorio exchanged punches, appellant slipped on the wet floor and fell. Solorio continued to punch appellant and stomped on him twice. Johnny tried pushing Solorio away, and Solorio pushed him back.

Appellant got up and looked in a mirror and saw the area around his eye was bleeding and swollen. After he saw Johnny leave, he exited through the back door of the shop and walked south to his mother's house, where he stayed the night. Sometime the next morning, he received a message on social media that Solorio had died from a drug overdose.

Appellant denied injuring Solorio. He claimed he did not have the opportunity to grab anything to use as a weapon to defend himself. He denied carrying a knife.

Kasten told appellant he previously stated he was picked up from the barbershop by a taxi. Appellant claimed he was drinking when they spoke over the phone and that he might have been confused. He did not recall telling Kasten that he went to his girlfriend's house that night and reaffirmed that he went straight to his mother's house. He denied going to a residence near the barbershop around 11:00 p.m. and asking to use the phone.

Kasten photographed appellant's injuries, which included the cut near his eye and various bruises. Appellant stated he was bleeding from his cut, but not profusely enough to leave a puddle of blood on the ground.

Appellant agreed to surrender his cell phone for examination. Appellant stated he recently lost his cell phone and was temporarily using an old phone that he still had. A forensic extraction of the phone showed it had been powered on for the first time two days after Solorio's death. At trial, a cell phone expert explained this may be due to the phone having been factory reset, which permanently deletes all data from the phone. Kasten also discovered appellant's social media page was deactivated four days after Solorio's death.

Appellant also agreed to surrender his shoes to compare with footprints found at the scene. He confirmed the shoes he was wearing were the same shoes he had on the night of Solorio's death. However, surveillance footage later revealed appellant was wearing different shoes that evening.

## VI.   Surveillance Footage.

Kasten reviewed surveillance footage from various cameras positioned in and around the shopping center where the barbershop was located. No surveillance footage was located inside the barbershop.

The surveillance footage showed appellant inside of the nearby liquor store at about 10:00 p.m. Shortly thereafter, Solorio and Johnny arrive on their motorcycles and enter the barbershop. At 11:01 p.m., Johnny leaves through the front door of the barbershop and rides away on his motorcycle. Six minutes later, appellant is shown walking from the alley behind the barbershop in the direction of the mobilehome park. Appellant returns to the front of the barbershop about 15 minutes later and appears to unlock the front door with a key. After another 15 minutes, appellant is shown walking out of the shopping center again.

At 3:16 a.m. appellant is shown walking through the shopping center to the front of the barbershop with a person identified as Ryan Guerra.[5] Approximately two hours later, appellant exits the barbershop and leaves through a back alley.

## VII.   Appellant's Arrest and Interview.

Appellant was arrested on August 31, 2021, and was transported to the police station and interviewed.

Appellant initially maintained that he left the barbershop soon after Johnny left, and that he walked straight to his mother's house. He denied returning to the barbershop later that evening or approaching a mobilehome park resident and asking to use her phone.

After Kasten confronted appellant with the surveillance footage and other evidence, he admitted he returned to the barbershop around 3:00 a.m. Appellant stated he went to get money from his workstation that he owed for rent. He initially denied recognizing Guerra, but later claimed he ran into Guerra on his way back to the barbershop, and Guerra "tagged along" with him. When they went into the barbershop, he did not see Solorio, and assumed he went home or was in the bathroom. Nothing inside of the barbershop looked different than how he left it, and he did not see Solorio's

---

**5**      Guerra did not testify at trial.

10.

body or blood on the floor.  After he retrieved his money, he left with Guerra through the back door, and they split up.  Appellant claimed he did not tell Kasten about returning to the barbershop before because he was disoriented that night and had been drinking.

Appellant also admitted he walked to the mobilehome park and asked a resident to use their phone because his cell phone was low on battery.  He told the resident he had been in a fight but denied stating that he stabbed someone at the barbershop and needed help.

Appellant repeatedly maintained that he did not stab Solorio.  He denied using a weapon during their altercation.

## VIII.  Appellant's Trial Testimony.

Appellant testified he worked with Solorio at the barbershop for about six months.  They were good coworkers, but sometimes had disagreements, one of which became physical.  Solorio was three inches taller and about 60 pounds heavier than appellant.

Appellant's description of the altercation with Solorio was consistent with his prior statements and Johnny's testimony.  However, appellant testified that after Johnny left the barbershop, Solorio turned off the lights and looked at him like he "wanted to finish what he started."  Solorio then rushed at him and punched him twice in the face.  As appellant fell to the ground, he grabbed his single-edged folding knife from his workstation because he felt his life was in danger.  Once he grabbed the knife, he started "swinging away" at Solorio's torso as he continued to fall.  Solorio continued throwing punches.  Appellant fell into a seated position, and started swinging the knife upward as Solorio was straddling him, striking him between his thighs.  Solorio eventually fell limp on top of him, and he rolled Solorio onto his back.  Solorio was moaning and yelled out, "What the hell, [appellant]?"  Appellant responded, "Look what you made me do."

Appellant saw Solorio was badly injured and assured him that he would call an ambulance.  He panicked, paced around the barbershop for a few minutes, then ran out of

11.

the back door without calling for help. He threw the knife into bushes behind the barbershop and ran toward the mobilehome park. He admitted he approached the mobilehome park resident and said that he hurt or stabbed someone in the barbershop. He returned to the barbershop to get his phone, which was next to Solorio's body. He then left and laid down somewhere to "get [his] mind right."

Appellant testified that about an hour later he saw Guerra walking around with his backpack, which he had dropped somewhere. He told Guerra what happened with Solorio, and Guerra agreed to help him clean up the barbershop. When they arrived, appellant decided to move Solorio's body because it was visible from the front window. They dragged Solorio's body into the bathroom, then appellant began mopping the floor. He gave up when he realized the mop bucket did not have a ringer. Guerra went through Solorio's pockets and took his cell phone, then left. Appellant remained in the store for another hour, trying to decide whether to finish cleaning up, then left through the back door and went to his mother's house.

Appellant claimed he acted in self-defense, and that he did not want Solorio to die. He agreed he had several opportunities to explain this to the police, but believed he would "get arrested and go in for a long time." He claimed he did not trust the police and did not think they would help him.

Appellant admitted he told numerous lies to try to cover up his involvement in Solorio's death. He lied to John that he did not know how Solorio was injured. He lied about being picked up in a taxi, going to his girlfriend's house, and not returning to the barbershop. He lied about not carrying a knife. He gave Kasten the shoes he was wearing during the interview even though he knew those were not the shoes he wore on the night of Solorio's death. He also admitted he factory reset his phone and disabled his social media account to conceal evidence against him.

## DISCUSSION

**I.**     **The Trial Court Properly Instructed the Jury on the Principles of Provocation and Heat of Passion Voluntary Manslaughter.  CALCRIM No. 522 Was Inapplicable and Unnecessary.  Instructional Error Did Not Occur.**

Appellant contends the trial court erred by declining his request to instruct the jury with CALCRIM No. 522 (Provocation:  Effect on Degree of Murder).  He argues the court was obligated to instruct the jury with the bracketed language from the instruction clarifying that provocation "may reduce a murder to manslaughter."  (CALCRIM No. 522.)  According to appellant, the failure to instruct with this language was federal constitutional error because it resulted in an incomplete instruction on the malice element of murder.  We conclude CALCRIM No. 522 was unwarranted, because the jury was properly instructed in CALCRIM No. 570 (Voluntary Manslaughter:  Heat of Passion) that provocation may reduce murder to voluntary manslaughter.

### A.     *Background.*

Prior to trial, appellant submitted a list of requested jury instructions, which included a check mark next to CALCRIM No. 522.  At a jury instructions conference held prior to closing arguments, the court and parties did not address whether CALCRIM No. 522 would be given.[6]

The trial court did not instruct the jury with CALCRIM No. 522.  However, it did give CALCRIM No. 570 (Voluntary Manslaughter:  Heat of Passion) and CALCRIM No. 571 (Voluntary Manslaughter: Imperfect Self-Defense).

### B.     *Standard of Review.*

In a criminal case, a trial court must instruct the jury on the essential elements of a charged offense (*People v. Merritt* (2017) 2 Cal.5th 819, 824) and on the general

---

**6**     Because respondent does not raise the issue, we do not address whether appellant forfeited the instructional error claim by failing to press for a ruling on the request.  (See *People v. Cunningham* (2001) 25 Cal.4th 926, 984.)

principles of law relevant to the issues raised by the evidence. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.)

A trial court may also be required to give a requested pinpoint instruction, which is an instruction that "relate[s] particular facts to a legal issue in the case or 'pinpoint[s]' the crux of a defendant's case." (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) "Parties are entitled to legally correct and factually warranted pinpoint instructions, should they request such additional instruction." (*People v. Lyon* (2021) 61 Cal.App.5th 237, 252.) "However, a trial court may properly refuse to give a pinpoint instruction that 'incorrectly states the law, is argumentative, duplicative, or potentially confusing [citation], or if it is not supported by substantial evidence.' " (*Ibid.*)

We review a claim of instructional error de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.) "Review of the adequacy of instructions is based on whether the trial court 'fully and fairly instructed on the applicable law.' " (*People v. Ramos* (2008) 163 Cal.App.4th 1082, 1088.) " 'In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole … [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' " (*People v. Yoder* (1979) 100 Cal.App.3d 333, 338.)

### C. *The Trial Court Did Not Err in Declining to Instruct the Jury With CALCRIM No. 522.*

CALCRIM No. 522, including the optional bracketed language, states:

"Provocation may reduce a murder from first degree to second degree [and may reduce a murder to manslaughter]. The weight and significance of the provocation, if any, are for you to decide.

"If you conclude that the defendant committed murder but was provoked, consider the provocation in deciding whether the crime was first or second degree murder. [Also, consider the provocation in deciding whether the defendant committed murder or manslaughter.]

14.

"[Provocation does not apply to a prosecution under a theory of felony murder.]"

Appellant contends the trial court's failure to give CALCRIM No. 522 relieved the prosecution of its burden to prove appellant acted with malice.[7] He relies on *People v. Schuller*, which held that the failure to instruct on voluntary manslaughter, where supported by substantial evidence, "amounts to an incomplete instruction on the malice element of murder." (*People v. Schuller* (2023) 15 Cal.5th 237, 254.) The high court reasoned that heat of passion and imperfect self-defense operate to negate the malice element of murder, and thus, to prove malice, the prosecution must disprove those circumstances beyond a reasonable doubt. (*Id.* at pp. 253–254.)

We are not persuaded. CALCRIM No. 522 is a pinpoint instruction that need not be given sua sponte. (*People v. Hernandez* (2010) 183 Cal.App.4th 1327, 1333; *People v. Rivera* (2019) 7 Cal.5th 306, 328.) It does not set forth the elements of an offense. Rather, it explains that evidence of provocation may reduce murder from first degree to second degree. (*People v. Ocegueda* (2023) 92 Cal.App.5th 548, 558.) It is a pinpoint instruction because, in this context, provocation is relevant only to the extent it negates or rebuts the prosecution's proof of an element of the offense. (*People v. Rogers* (2006) 39 Cal.4th 826, 878; see *People v. Saille*, *supra*, 54 Cal.3d at p. 1117.)

Here, CALCRIM No. 522 was unnecessary because appellant had already been acquitted of first degree murder in his initial trial. Whether evidence of provocation could reduce murder from first degree to second degree was irrelevant, because appellant could not have been convicted of first degree murder.

---

[7] While appellant's argument focuses on whether the jury was properly instructed on heat of passion voluntary manslaughter, he also briefly asserts that the omission of CALCRIM No. 522 "fatally impaired the instructions on … imperfect self-defense." It is well established that imperfect self-defense is not based on provocation, but on "an actual, though unreasonable, belief in the need for self-defense." (*People v. Rios* (2000) 23 Cal.4th 450, 461; see *In re Christian S.* (1994) 7 Cal.4th 768, 773; CALCRIM No. 522.) We need not address this conclusory assertion further.

15.

Appellant does not dispute this, but he contends CALCRIM No. 522 should still have been given for the bracketed language explaining that provocation may also reduce murder to manslaughter. While it is unclear whether appellant suggests the entire instruction should have been given, or only the bracketed language, either approach would have been problematic. Instructing the jury that provocation may reduce murder from first degree to second degree, even though the jury was not instructed on first degree murder or asked to consider premeditation and deliberation, would have been pointless and unnecessarily confusing. Similarly, giving only the bracketed language, which clarifies that provocation may *also* reduce murder to manslaughter, would make little sense outside of the context of the entire instruction.

Regardless, to the extent the bracketed language was relevant, it was unnecessary. The jury was instructed with CALCRIM No. 570, which set forth in detail the legal standards for heat of passion voluntary manslaughter. Specifically, the trial court instructed the jury that murder is reduced to voluntary manslaughter if:

"1. [Appellant] was provoked;

"2. As a result of the provocation, [appellant] acted rashly and under the influence of intense emotion that obscured his reasoning or judgment;

"AND

"3. The provocation would have caused a person of average disposition to act rashly and without due deliberation, that is, from passion rather than from judgment."

The court also instructed that "[t]he People have the burden of proving beyond a reasonable doubt that [appellant] did not kill as a result of a sudden quarrel or in the heat of passion."

Because the jury was instructed with CALCRIM No. 570, the bracketed language from CALCRIM No. 522 clarifying that provocation may reduce a murder to manslaughter would have been redundant. "[A] trial court need not give a pinpoint

16.

instruction if it merely duplicates other instructions." (*People v. Whisenhunt* (2008) 44 Cal.4th 174, 220.) Accordingly, our independent review reveals the jury was "fully and fairly" instructed on the elements of murder and heat of passion voluntary manslaughter, and this claim lacks merit.[8] (*People v. Ramos*, *supra*, 163 Cal.App.4th at p. 1088.)

## II. Appellant's Second Degree Murder Conviction Was Supported By Substantial Evidence.

In his motion for a new trial, appellant argued the second degree murder verdict was contrary to the evidence. (§ 1181, subd. (6).) He now claims the trial court abused its discretion in denying the motion, alleging that "at most, this case involved voluntary manslaughter." We conclude the trial court properly denied the motion because the second degree murder conviction was supported by substantial evidence.

### A. Background.

In denying appellant's motion for a new trial, the trial court rejected appellant's claim that the verdict was contrary to the evidence. The court began by noting that appellant admitted to killing Solorio with his own knife, and thus the main issue at trial was whether appellant acted in perfect or imperfect self-defense, or whether any provocation was sufficient to reduce second degree murder to voluntary manslaughter. With respect to self-defense, the court reasoned that the 35 knife wounds to Solorio's body, including to his head, neck, and chest, support the finding that appellant used more force than was necessary to repel any alleged attack. Moreover, appellant's testimony that he acted in self-defense lacked credibility given the inconsistencies between his trial testimony and prior statements and lies throughout the investigation. The court also concluded that heat of passion voluntary manslaughter was not supported by the

---

[8] Appellant raised the same instructional error claim below in his motion for a new trial. He contends the trial court erred by failing to assess prejudice under the proper legal standard. Because we conclude that instructional error did not occur, we need not address this contention.

17.

evidence, explaining that "[a] look or punch" from Solorio was insufficient to establish provocation under the applicable standard. Based on the entirety of the evidence at trial, the court concluded, "[T]he death of Solorio was a revenge killing."

### B. *Standard of Review.*

"Penal Code section 1181, subdivision (6) permits a defendant to move for a new trial on the ground that the verdict is contrary to the evidence. In deciding such a motion, the trial court's function is to 'see that the jury intelligently and justly perform[ed] its duty and, in the exercise of a proper legal discretion, to determine whether there is sufficient credible evidence to sustain the verdict.' " (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251.) "The trial court has broad discretion in determining whether the evidence has sufficient probative value to sustain the verdict [citation], and its order will not be reversed on appeal 'absent a manifest and unmistakable abuse of that discretion.' " (*Id.* at p. 1252.) An order denying such a motion will only be reversed where, as a matter of law, the verdict was not supported by substantial evidence. (*Ibid.*; see *People v. Jimenez* (2019) 32 Cal.App.5th 409, 423.)

In assessing sufficiency of the evidence to support a conviction, "we review the entire record in the light most favorable to the prosecution to determine whether it contains [substantial] evidence that is reasonable, credible and of solid value, from which a rational trier of fact could find that the elements of the crime were established beyond a reasonable doubt." (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether ' "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." ' " (*People v. Tripp*, *supra*, at p. 955, italics omitted.)

### C.    *Substantial Evidence Supported the Jury's Verdict.*

Based on our review of the record, we agree with the trial court's assessment of the evidence.  It is undisputed that appellant killed Solorio by inflicting 35 different knife wounds.  The only question at trial was whether appellant acted in perfect or imperfect self-defense, or in the heat of passion.  We conclude substantial evidence supported the jury's rejection of these defense theories.

Initially, we observe that appellant's claim of self-defense was largely predicated on his own testimony.  But as the trial court observed, appellant's credibility was severely diminished by his numerous lies and inconsistencies, giving the jury abundant reason to reject his self-defense claim.  As detailed above, despite being interviewed on three different occasions, he never told the police that he acted in self-defense.  He admitted he lied numerous times during the investigation to cover up his involvement in Solorio's death.  He falsely told the police that he did not carry a knife, that he left the barbershop in a taxi, and that he did not return to the barbershop later that evening.  Moreover, appellant fled from the barbershop without contacting the authorities or seeking medical assistance for Solorio.  He made repeated efforts to conceal and destroy evidence, including dragging Solorio's body out of view, attempting to clean the crime scene, employing a factory reset on his cell phone, and intentionally providing Kasten with the wrong shoes for footprint comparison.  These actions not only undermined appellant's credibility, but also constituted compelling evidence of consciousness of guilt.  (See § 1127c; Evid. Code, § 413; *People v. Kimble* (1988) 44 Cal.3d 480, 496; *People v. Hutchinson* (1969) 71 Cal.2d 342, 346; *People v. Hart* (1999) 20 Cal.4th 546, 620–621.)

Appellant's self-defense claim was also unsupported by the evidence.  Solorio was unarmed.  Despite this, appellant inflicted 35 knife wounds, including stab wounds to Solorio's chest, abdomen, and neck.  Solorio also had an apparent defensive wound to his index finger, suggesting he attempted to block appellant's knife strike with his hand.  According to the forensic pathologist, it would have taken several minutes to inflict the

19.

35 knife wounds. Thus, the number, location, and severity of Solorio's injuries are inconsistent with the use of deadly force reasonably necessary to fend off an unarmed attacker. Rather, Solorio's wounds point to a calculated attack executed with the intent to kill.

Appellant also asserts on appeal that the evidence overwhelmingly supports that he acted during the heat of passion.[9] However, appellant repeatedly stated and testified that he acted in self-defense. He did not claim that he was provoked by Solorio's actions and acted "not out of rational thought but out of unconsidered reaction to the provocation." (*People v. Beltran* (2013) 56 Cal.4th 935, 942.) In addition, Johnny's testimony established that several minutes elapsed between the initial altercation and Solorio's death. During this time, appellant remained in the shop, fixing his hair and tending to his wound. Thus, the jury was entitled to conclude that even if appellant was provoked by Solorio during the initial altercation, sufficient time had elapsed for his "passions to 'cool off' and for judgment to be restored." (*Id.* at p. 951.)

Considering the totality of the evidence, including the fact that Solorio was unarmed, the number and placement of Solorio's injuries, and appellant's lies, flight, and efforts to conceal evidence, the jury had ample basis to reject the defense theories of perfect or imperfect self-defense and heat of passion. Therefore, we conclude the jury's verdict was supported by substantial evidence, and the trial court did not err in denying a motion for a new trial on that basis.

---

[9] In support of this claim, appellant cites to the preliminary hearing transcript of Johnny's testimony and Guerra's law enforcement interview. Because these items were not admitted into evidence at trial, we do not consider them here. (See *People v. Hernandez* (1957) 150 Cal.App.2d 398, 402.)

20.

**III. Appellant Was Not Prohibited from Retaining a Competent Expert Witness. He Did Not Receive Ineffective Assistance of Counsel.**

Appellant contends he received ineffective assistance of counsel on various grounds. He claims defense counsel failed to make adequate efforts to retain a competent expert witness, did not adequately prepare him for trial, and should have impeached the mobilehome park resident with her prior statements. Relatedly, he contends that the Fresno County Superior Court's expert witness "fee cap" violated his constitutional right to effective representation. We address each claim in turn.

### A. The "Fee Cap" on Indigent Defendant Expert Witness Fees Did Not Limit Appellant's Ability to Retain a Competent Expert Witness.

Appellant argues the Fresno County Superior Court's expert witness "fee cap" is unconstitutional because it forces indigent defendants to retain "inferior quality" expert witnesses. He claims it prohibited him from retaining a competent expert witness in forensic pathology.

#### 1. Background.

Appellant was represented at trial by court-appointed counsel. In March 2022, several months before retrial, defense counsel filed an ex parte request for funding to retain an expert witness. In the accompanying declaration, defense counsel stated that after reflecting on the initial trial, he concluded he needed to retain a forensic pathologist to address the manner in which Solorio suffered his injuries. Defense counsel explained he "understand[s] that the County limits the rate of compensation for expert witnesses to $250 per hour," and that he has been unable to locate a forensic pathologist willing to accept that rate. He contacted 11 different forensic pathologists, and the lowest rate he could find was with Doctor Marvin Petruszka, who agreed to consult and testify at a rate of $300 per hour. Defense counsel requested the court grant authorization to exceed the "[c]ounty limit" and retain Petruszka. The trial court granted the request.

Petruszka prepared a report stating he was asked to comment on Solorio's position when he sustained stab wounds to the left chest. He explained that based on his review of the evidence he is unable to give an opinion as to whether Solorio was "standing or lying in a supine position." With respect to the knife wounds to Solorio's legs, he could only opine that the attacker was apparently in a "lower position" than Solorio.

Prior to trial, defense counsel sent a copy of Petruszka's report to the prosecutor. The prosecutor responded by providing citations to several unpublished cases summarizing Petruszka's prior testimony. He remarked that he found the testimony "interesting," and that a "simple [W]estlaw search of [Petruszka's] name reveals a LOT."

Defense counsel did not call Petruszka as a witness at trial.

## 2. Appellant fails to show the fee cap is constitutionally deficient or that it limited his ability to retain a competent expert.

The right to effective representation under the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution includes "reasonably necessary ancillary defense services" provided at public expense. (*Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 319.) For this reason, "upon a proper showing of necessity, the trial court must provide to an indigent defendant expert defense services." (*People v. Worthy* (1980) 109 Cal.App.3d 514, 521.) The defendant bears the burden of demonstrating that such expert services are necessary. (*People v. Thomas* (2023) 14 Cal.5th 327, 353.) However, "[j]ust as an indigent defendant is not entitled to choose her own attorney, so too are there limits on her ability to choose her own experts." (*Doe v. Superior Court* (1995) 39 Cal.App.4th 538, 545.) The constitutional right to effective representation guarantees "access to a competent" expert, not the right to choose an expert of his or her "personal liking." (*Ake v. Oklahoma* (1985) 470 U.S. 68, 83.)

We begin by observing that appellant does not identify the statute, rule, regulation, or policy that he seeks to challenge.  From the declaration of defense counsel, it appears the fee cap may have been part of a contract between defense counsel's law firm and "Fresno County to provide legal representation to the indigent."  The declaration further states that the contract provides that ancillary defense services will be paid by Fresno County, but the County limits the rate of compensation to $250 per hour.  In addition, the trial court's order denying appellant's motion for a new trial references a superior court "expert witness fee policy," that imposes a "cap" on such fees.  However, appellant does not identify the legal mechanism by which this fee cap was imposed.

In the absence of such information our ability to review the validity of the fee cap is limited.  We do not know which legal body imposed the fee cap, how it is enforced, whether the fee cap is set at the same rate for every defendant, and under what circumstances it may be exceeded.  Thus, we can only assess how the fee cap was implemented in the instant case, and whether it deprived appellant of his constitutional right to effective representation.

Based on the record before us, the $250 fee cap did not violate that right.  In response to defense counsel's ex parte request, the trial court granted defense counsel's request to exceed the fee cap by 20 percent to retain an expert witness.  This is consistent with the applicable constitutional standard that indigent defendants are entitled to expert witness services " 'only upon a showing they are reasonably necessary.' " (*People v. Thomas*, *supra*, 14 Cal.5th at p. 353.)  This reasonably necessary requirement also comports with equal protection principles.  (*People v. Faxel* (1979) 91 Cal.App.3d 327, 331.)

Appellant claims the fee cap limited his ability to retain a competent expert.  He argues he was forced to retain Petruszka because he was the least expensive option, and that Petruszka was an inferior expert.  He cites to several unpublished appellate cases summarizing Petruszka's testimony, which include testimony that a driving under the

23.

influence defendant was only impaired by symptoms of diabetes, and testimony in a child abuse murder case that the defendant was dizzy from medication and accidentally dropped the child victim. According to appellant, these cases indicate Petruszka entertains "fringe unscientific theories." Appellant also notes that the prosecutor alerted defense counsel to Petruszka's prior testimony, alleging the prosecutor implied Petruszka is a "quack."

These examples do not persuade us that Petruszka is incompetent. He is a board certified pathologist and associate professor of pathology at the University of Southern California Keck School of Medicine. His curriculum vitae reveals extensive experience in the field, including numerous honors and publications. As the trial court observed, Petruszka "is hardly an intellectual lightweight." The fact that Petruszka has served as a defense expert in prior cases and offered opinions contrary to the prosecution is to be expected from any expert witness who regularly testifies for the defense. And appellant does not explain why his opinions in these prior cases, which are not ostensibly absurd, suggest his work is "unscientific." Similarly, the prosecutor's vague criticism of Petruszka's prior testimony is conclusory and does little to establish he is unqualified.

To conclude, based on what we can deduce from the record, the Fresno County Superior Court's fee cap may be exceeded upon a showing of reasonable necessity, in accordance with applicable constitutional standards. Defense counsel was able to make such a showing and retain Petruszka, a qualified expert, to assist in appellant's defense. Accordingly, appellant was not denied effective representation at trial, and this claim fails.

### B. *Defense Counsel Made Sufficient Efforts to Retain a Competent Expert Witness.*

In addition to arguing the fee cap violated his constitutional rights, appellant raises the related claim that defense counsel was ineffective because he did not request an in camera hearing to address the issue of expert witness funding. We reject this claim.

To prevail on an ineffective assistance of counsel claim, the claimant must establish counsel's performance fell below an objective standard of reasonableness, and that prejudice occurred as a result. (*Strickland v. Washington* (1984) 466 U.S. 668, 687–688.) The defendant has the burden of showing both deficient performance and resulting prejudice. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.)

Defense counsel filed an ex parte request for expert witness funding several months before trial. The trial court granted the request to exceed the fee cap, which allowed appellant to retain Petruszka, who, as we explained above, was a competent and qualified expert. While defense counsel had the option of requesting an in camera hearing (*People v. Faxel*, *supra*, 91 Cal.App.3d at pp. 330–331, fn. 1), it was unnecessary. Appellant was able to make an adequate showing of reasonable need in the ex parte request. Thus, appellant fails to meet his burden of showing defense counsel's performance was deficient.

Appellant also fails to establish a reasonable likelihood the outcome of the trial would have been different absent the alleged error. (*Strickland v. Washington*, *supra*, 466 U.S. at p. 696.) Appellant does not explain how retention of a different expert witness might have changed the outcome of the trial. Considering the location, severity, and number of Solorio's wounds, it is difficult to conceive of a hypothetical expert opinion that would have persuaded the jury appellant acted in self-defense. Appellant therefore fails to establish he was prejudiced by defense counsel's purported error.

### C. *Appellant Fails to Establish Defense Counsel Did Not Adequately Prepare Him for Trial.*

Next, appellant argues defense counsel made inadequate efforts to prepare him for trial. He claims defense counsel rarely visited him in custody, did not ask appellant to tell him his version of events, and did not review with him the surveillance footage, statements of witnesses, or appellant's statements to law enforcement.

These claims are unsupported by the record. According to a jail visitation log submitted by the prosecution, during the 10 and a half months that defense counsel represented appellant, he visited appellant 15 times, and his investigator visited appellant seven times. Appellant asserts this was insufficient for defense counsel to have reviewed the evidence with appellant and adequately prepared him for trial. But the visitation log does not include phone calls, or any conversations that occurred during appellant's trials and numerous court appearances. More importantly, it does not reflect what was discussed during the visits. On this record, appellant fails to overcome the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance." (*Strickland v. Washington*, *supra*, 466 U.S. at p. 689.)

Aside from the visitation logs, appellant relies on the assertion of appellate counsel, based on "information and belief," that defense counsel did not review the evidence with appellant or prepare him for trial. These conclusory hearsay assertions are not evidence, and we afford them no weight. (See *People v. Oppel* (1990) 222 Cal.App.3d 1146, 1153.) Appellant therefore fails to carry his burden of establishing defense counsel was ineffective on this ground.

### D. Appellant Fails to Show Defense Counsel's Decision Not to Impeach the Mobilehome Resident With Her Prior Statements Was Ineffective Representation. Appellant Was Not Prejudiced By the Alleged Error.

Finally, appellant alleges defense counsel should have impeached the mobilehome park resident with her prior statement to law enforcement. During trial, the resident testified appellant stated he needed to use her phone because he stabbed and killed someone at the barbershop, and that he needed someone to pick him up or the police were going to get him. In contrast, according to a transcript of her law enforcement interview the day after Solorio was killed, the resident only stated appellant asked to use her phone because he "just stabbed someone at the barbershop" and was "afraid." Appellant argues

the resident's prior statement would have shown appellant was merely scared and seeking help and was not attempting to avoid law enforcement.

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas*, *supra*, 12 Cal.4th at pp. 436–437.) Thus, on direct appeal, if the record "sheds no light on why counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one, or there simply could be no satisfactory explanation." (*People v. Carter* (2003) 30 Cal.4th 1166, 1211.) In other words, the record must "affirmatively disclose[] that counsel had no rational tactical purpose for his act or omission." (*People v. Fosselman* (1983) 33 Cal.3d 572, 581.)

Appellant fails to meet this burden. Defense counsel may have reasonably concluded the prosecution's admission of the resident's answering machine message, which was consistent with her law enforcement interview, was sufficient to establish her prior inconsistencies. Additionally, defense counsel may have made the strategic decision to avoid further highlighting appellant's inculpatory statements and conduct. Even without the statement that he was trying to avoid the police, appellant's flight from the barbershop, admission to the resident that he stabbed someone, and generic request to make a phone call was strong evidence of consciousness of guilt. Thus, it would have been reasonable for defense counsel to conclude the benefits of impeaching the resident with the interview transcript were outweighed by the risk of lingering on such damaging evidence during cross-examination.

Appellant also fails to establish prejudice. Appellant's lies, efforts to conceal and destroy evidence, and flight from the crime scene overwhelmingly established his desire to conceal his involvement in Solorio's death and avoid the attention of law enforcement. Impeachment of the resident with her prior statement would have done little to undermine

27.

this conclusive evidence of appellant's consciousness of guilt.  Appellant therefore fails to establish a reasonable likelihood that such impeachment would have resulted in a different outcome, and the ineffective assistance of counsel claim fails.

## **DISPOSITION**

The judgment is affirmed.

LEVY, Acting P. J.

WE CONCUR:

MEEHAN, J.

DE SANTOS, J.